UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA          :     CR10-175-01ML

                                  :     CR. No. 10-

                                  :

              v.                  :

                                  :     In violation of

                                  :

JOHN A. ZAMBARANO                 :     18 U.S.C. § 371
ROBERT RICCI                      :     18 U.S.C. § 1341
VINCENT DIPAOLO                   :     18 U.S.C. § 2
LORI SERGIACOMI                   :
       a/k/a TANYA CRUISE         :


### INDICTMENT

The Grand Jury charges that:

### INTRODUCTION

At all times material to this Indictment:

1.   Defendant JOHN A. ZAMBARANO ("ZAMBARANO") was a resident of
North Providence, Rhode Island, and a Rhode Island licensed
residential contractor.

2.   ZAM'S CARPETING, INC. was a Rhode Island corporation owned
by ZAMBARANO and operated as a residential contractor's
business.

3.   Defendant ROBERT "BOBBY" RICCI ("RICCI") was a resident of North Providence, Rhode Island.  RICCI owned and operated a residential contractor's business called R.A.R. Building and Home Improvement LLC. RICCI often worked with ZAMBARANO on various home repair jobs.

4.   RICCI was a hearing officer for the Rhode Island Contractor's Registration and Licensing Board. As such, RICCI was designated by the executive director of the Rhode Island Contractor's Registration and Licensing Board to hear contested claims and cases, contested enforcement proceedings, and contested administrative fines.

5.   Defendant VINCENT "VINNY" DIPAOLO ("DIPAOLO") represented himself to be a public insurance adjuster with an office in Providence, Rhode Island.  In fact, DIPAOLO's insurance adjuster's license had been revoked by the Rhode Island Department of Business Regulation on December 21, 2007. Accordingly, throughout the period of this indictment DIPAOLO was not licensed to act as a public insurance adjuster.

6.   VDP UNITED CONSULTANTS, INC. ("UNITED") was a Rhode Island corporation owned and operated by DIPAOLO.

2

7.  Defendant LORI SERGIACOMI ("SERGIACOMI") was a resident of North Providence, Rhode Island.  SERGIACOMI was an on-air radio personality using the alias "TANYA CRUISE."

8.  SERGIACOMI's personal residence sustained damage caused by record rainfall, flooding and rising ground water in the Rhode Island flood of March 2010 ("the March 2010 flood").

9.  An insurance company, whose true name is known to the grand jury, (hereinafter "the Insurance Company") was operating in interstate commerce with its principal office in Boston, Massachusetts.

10. A local insurance agency, whose true name is known to the grand jury, (hereinafter "the local insurance agency") was an insurance agency operating in interstate commerce with its principal office located in North Providence, Rhode Island.

11. A disaster mitigation services company whose true name is known to the grand jury, (hereinafter "The Water Removal Company") was a Rhode Island corporation that performed disaster relief services, including water mitigation

3

services related to flood damage.

12. John Doe, whose true identity is known to the grand jury, was a representative of the Water Removal Company.

13. The Federal Emergency Management Agency ("FEMA") was a component federal agency of the United States Department of Homeland Security, whose responsibilities included providing assistance in the wake of natural disasters.

14. SERGIACOMI had a homeowners insurance policy issued by the Insurance Company. SERGIACOMI's homeowners insurance policy did not cover damage caused by flooding.

## COUNT ONE
## CONSPIRACY
## 18 U.S.C. 371

15. Paragraphs 1 through 14 are hereby realleged as if fully set forth herein.

### The Conspiracy

16. From a date unknown but at least as early as March 31, 2010, and continuing through at least on or about August 25, 2010, in the District of Rhode Island and elsewhere, the defendants

4

JOHN A. ZAMBARANO
ROBERT RICCI
VINCENT DIPAOLO and
LORI SERGIACOMI a/k/a TANYA CRUISE

did knowingly, willfully and unlawfully combine, conspire
and agree with each other to knowingly and willfully devise
and attempt to devise a scheme and artifice to defraud, and
for obtaining money and property by means of false and
fraudulent pretenses, representations and promises and to
cause items to be delivered by the United States mails
according to the directions thereon for the purpose of
executing said scheme and artifice to defraud, in violation
of Title 18, United States Code, Section 1341.

## The Objects of the Conspiracy

17. It was the purpose and objective of the conspiracy for
ZAMBARANO, RICCI, DIPAOLO and SERGIACOMI to obtain money
from the Insurance Company by fraudulently causing damage
sustained to SERGIACOMI'S residence during the March 2010
flood, and additional damage caused by ZAMBARANO, RICCI,
DIPAOLO and SERGIACOMI, to appear to have been caused by a
windstorm on April 5, 2010, so that it would be covered by
SERGIACOMI's insurance policy.

## Manner and Means of the Conspiracy

18. It was part of the conspiracy that in March 2010, after

SERGIACOMI suffered damage to her residence from rising ground water from the March 2010 flood, DIPAOLO and ZAMBARANO advised SERGIACOMI to file a claim with her insurance company falsely claiming the damage was caused by a windstorm because SERGIACOMI did not have flood insurance.

19.   It was further part of the conspiracy that DIPAOLO and ZAMBARANO advised SERGIACOMI not to file a claim with FEMA for damage related to the March 2010 flood because FEMA payments would be in the form of a loan which SERGIACOMI would be required to pay back; because FEMA would not pay for additional repairs and improvements which were unrelated to flood damage, but which SERGIACOMI desired for her residence, including SERGIACOMI's roof and swimming pool; and because a FEMA claim could be subject to additional scrutiny as compared to an insurance claim.

20.   It was further part of the conspiracy that DIPAOLO, ZAMBARANO, RICCI and SERGIACOMI intentionally caused physical damage to SERGIACOMI's residence and swimming pool to make it appear that a windstorm on April 5, 2010 caused damage to SERGIACOMI's roof and pool, rather than ground water caused by the Rhode Island flood of March 2010.

21.   It was further part of the conspiracy that SERGIACOMI and
      DIPAOLO filed a fraudulent claim with SERGIACOMI's insurance
      company which falsely claimed that her residence sustained
      damage to the roof, interior, and swimming pool from a
      windstorm on April 5, 2010, when in truth and in fact, there
      was no damage caused by a windstorm on April 5, 2010, and
      any damage that did exist in SERGIACOMI's residence was
      caused by the March 2010 Flood and by ZAMBARANO, RICCI,
      DIPAOLO and SERGIACOMI.

22.   It was further part of the conspiracy that in order maximize
      the amount of money they could fraudulently obtain, DIPAOLO
      and ZAMBARANO created fraudulent invoices to be used to
      estimate the cost of repairs to SERGIACOMI's residence.

23.   It was further part of the conspiracy that DIPAOLO and
      SERGIACOMI deceived the insurance adjuster representing the
      Insurance Company with respect to the date and cause of the
      damage and the cost of repairs to SERGIACOMI's residence.

24.   It was further part of the conspiracy that DIPAOLO omitted
      an invoice from the Water Removal Company from the claim he
      filed with the Insurance Company on behalf of SERGIACOMI in
      order to prevent scrutiny which might cause the Insurance

7

Company to realize the damage was related to the March 2010 flood.

25.   It was further part of the conspiracy that DIPAOLO, ZAMBARANO, RICCI and SERGIACOMI caused the Insurance ompany to mail checks in payment of the fraudulent insurance claim.

## Overt Acts In Furtherance of the Conspiracy

26.   In furtherance of the conspiracy, and to accomplish its objects and purposes, at least one of the following overt acts, among others, were committed by one or more of the defendants in the District of Rhode Island and elsewhere.

27.   On or about March 31, 2010, SERGIACOMI hired DIPAOLO to act as a public insurance adjuster to represent her with respect to her claim to the Insurance Company.  DIPAOLO utilized a "Power of Attorney" form despite having his public insurance adjuster's license revoked by the Rhode Island Department of Business Regulation.

28.   On or about March 31, 2010, DIPAOLO directed the Water Removal Company to SERGIACOMI's residence for the purpose of removing ground water caused by the March 2010 flood from the basement.

29. On or about April 1, 2010, at approximately 3:46 p.m., after being advised by John Doe, a representative of the Water Removal Company, that the water in her basement was from the flood and was not likely to be covered by her insurance policy and that SERGIACOMI should consider filing a claim with FEMA for flood relief, SERGIACOMI had a telephone conversation with ZAMBARANO in which the following was stated:[1]

JZ:   What's the matter?

LS:   [John Doe] was here.   [John Doe] was here earlier.

JZ:   Who's [John Doe]?

LS:   The guy that owns the what do you call it?...[The Water Removal Company].

JZ:   Yeah.

LS:   They're the people that are pumping out the water, ripping half the rug, and they're coming back tomorrow and I have to meet here at two. Here's the thing. [John Doe] who owns the company, they're out of Lincoln. He said to me that I want to call up, um, what is it? FEMA. He said I want to talk to Vinny about that and calling up FEMA because they'll work with them. I ...I don't know until I talk to Vinny. He told me to go ahead and call FEMA right away, but I'm not doing that until I talk to Vinny.

---

[1]In quotations throughout this indictment, the individual speaking is identified by the initials of the person's first and last name. John Zambarano is "JZ"; Lori Sergiacomi is "LS"; Robert Ricci is "RR" and Vincent DiPaolo is "VD."

JZ:   Alright, let me call Vinny right now.

LS:   Okay.


30.   On or about April 1, 2010 at approximately 3:47 p.m.,

ZAMBARANO called DIPAOLO to discuss the possibility that

SERGIACOMI might contact FEMA:

JZ:   Vin.

VD:   Yeah.

JZ:   Tanya Cruise just called me.

VD:   Yup.

JZ:   The fuckin' guy [John Doe] from the
      company you sent over there told her to call
      FEMA, they'll help you out.  I...she's
      calling me up, should I call? I said, no...no
      the insurance is going to be involved in
      this.

VD:   No, the FEMA's, a fuckin'....they haven't even
      declared that yet for Christ sakes.

JZ:   He's telling her to call FEMA.

VD:   Oh (Unintelligible, hereinafter "UI")...

JZ:   I said FEMA ain't ....FEMA ain't gonna take care
      of your pool or nothing. Just leave it the way it
      is.

VD:   Yeah.

JZ:   Alright, I, I got to call her back.

VD:   (UI)....mind their fucking, just get over there
      and do what you got to do.  You got to  do the
      mediation and  everything else first over there
      so...

JZ:   I know.  I know.

10

VD:   Fucking crazy.  I'm trying to put a claim in
      and he's going to let FEMA in...fucking...

JZ:   I know.

VD:   FEMA's not paying right now.

JZ:   Alright, I'm going to call her back before she
      calls 'em.

VD:   Alright.

JZ:   Alright and then you talked to that woman?

VD:   FEMA, they're only giving loans out, tell her.

JZ:   Yeah, I know.

VD:   Yeah, alright right now there just giving loans
      out.

31.  On or about April 1, 2010 at approximately 3:48 pm,

     ZAMBARANO advised SERGIACOMI not to file a claim with FEMA:

JZ:   Lor....

LS:   Yeah John.

JZ:   He starts screaming.  He said why don't these
      fuckin people mind their own business.  He said
      FEMA is ...is a government funded agency that
      gives you interest free loans to take care of
      things.  You got to pay that back.  He said just
      let it stay.  This was damage for the roof.  All
      this is going to lead to her roof.

LS:   I know that's cool, but according to [John Doe]
      you don't have to pay it back.  They are giving it
      out like Haiti aid.

JZ:   No. No, he said "Forget it."

LS:   Alright.

11

32.   On or about April 1, 2010 at approximately 4:00 p.m.,

DIPAOLO called ZAMBARANO to further discuss the possibility

that SERGIACOMI might contact FEMA:

> VD:   Okay, so I mean like, you know.  [John Doe] was
> just like, you know caught up in the fucking
> excitement of the whole fucking thing.  You know
> trying to give out some good information.  He
> wasn't even fucking thinking when he told her.  I
> just called him.  I said, "[John Doe] what are you
> fuckin stupid?  Your fuckin' tellin' the broad to
> call FEMA.  She wants to not even call her
> insurance company.  What are you crazy?" You know.

> JZ:   Yeah, FEMA ain't gonna take care of her pool.

> VD:   They're not gonna take care... I told him, I said
> "[John Doe]...the pool and the roof and all that
> fuckin' shit, you know." He says "Well, they're
> going to have a hard time collecting." I says,
> "Don't worry, leave that up to me.  I'll take care
> of that."

> JZ:   Yup. Alright. I told her, so she's not gonna
> call.

33.   In the conversation on about April 1, 2010 at approximately

4:00 p.m., DIPAOLO and ZAMBARANO discussed the reasons they

did not want SERGIACOMI to contact FEMA:

> VD:   ...FEMA's only, right now they're just givin' out
> fuckin', you know,  government loans, no interest
> loans to fix your house. You got to pay it back.

> JZ:   Yeah, that's what I told her.

> VD:   I know and if even if that lady comes in,
> Napolitano [the United States Secretary of
> Homeland Security], and declares this a
> fuckin' disaster area.  You know... it...
> it... in other words their not gonna cover.
> They're not gonna cover anything on the roof.
> They're only gonna cover shit in the

12

basement, water, you know, so....

JZ:  Yeah.

34.  In the conversation April 1, 2010 that began at
approximately 3:48 pm, ZAMBARANO and SERGIACOMI discussed
using a tree branch to cause damage to SERGIACOMI's swimming
pool for the purpose of filing a false insurance claim:

JZ:  I'll be there tomorrow though.

LS:  Okay, what time? I'm gonna be here at 2:00.

JZ:  No.  It doesn't matter.  You don't have to be
     home... ...It's gonna be after 2:00 anyways.
     What I'm gonna do is take the ladder in the back
     go on the roof. Do what I got to go over there
     and get the branch for the pool.... So I'll
     be there in the afternoon.

LS:  And listen....

JZ:  Yup..

LS:  If you have to.....

JZ:  Yup.

LS:  ...in my garage.  Walk in my garage...

JZ:  Yup.

LS:  ...to the right.

JZ:  Yup.

LS:  You'll see a good size little branch that could do
     it.

JZ:  Oh, alright.

LS:  Just to let you know.

JZ:  Okay.

13

35. On or about April 3, 2010, at SERGIACOMI's direction, ZAMBARANO intentionally caused damage to SERGIACOMI's swimming pool with a tree branch for the purpose of filing a false insurance claim.

36. On or about April 3, 2010, at approximately 11:54 a.m., ZAMBARANO informed DIPAOLO that he had caused damage to SERGIACOMI's swimming pool for the purpose of filing a false insurance claim:

> JZ:  Vinny.
>
> VD:  Yeah.
>
> JZ:  Alright, I took care of the pool over there. She didn't call the insurance company yet. She's gonna call them first thing Monday.
>
> VD:  Alright.

37. In the conversation April 3, 2010, beginning at approximately 11:54 a.m., DIPAOLO directed ZAMBARANO where to cause damage to SERGIACOMI's roof for the purpose of filing a false insurance claim and also discussed the damage ZAMBARANO caused to SERGIACOMI's swimming pool:

> JZ:  I just got to go on the roof later on this afternoon and do what I got to do over there. I got a good size branch....made a...you know a hole in the thing and it went through the liner.
>
> VD:  Uh...just make sure that..uh..the roof...

14

> uh...it's over the kitchen area, over the
> bathroom area.

    JZ:   Yup.

    VD:   Okay.

    JZ:   And...uh..and I made a hole through the liner
          and all the water went behind the liner and
          underminded it.

    VD:   No kidding, wow. That's unbelievable. Alright.

38. On or about April 3, 2010, at approximately 12:09 p.m.,

ZAMBARANO and RICCI discussed causing damage to SERGIACOMI's

roof for the purpose of filing a false insurance claim:

    JZ:   Bobby.

    RR:   Yeah.

    JZ:   What are you doing later on?

    RR:   Why? What's the matter?

    JZ:   You come over Lori Sergiacomi's with me? Vinny
          showed me what to do with that roof and those
          certain sections.

    RR:   Why he wants to patch it?

    JZ:   No, we got to pull it up, pull some shingles
          up and put, some drop, and put some canvasses
          on top of it with a piece of furring.

    RR:   With what?

    JZ:   He said, he told me where to rip some shingles
          up.

    RR:   Yeah.

39. In the April 3, 2010 conversation which began at

approximately 12:09 p.m., ZAMBARANO and RICCI discussed the

need to cause the damage to SERGIACOMI's roof before

SERGIACOMI filed the insurance claim:

> RR:   Okay, and what time you want to do this?
>
> JZ:   Ah, any time this afternoon?
>
> RR:   Oh..(UI)...why does it have to be done today?
>
> JZ:   Well, when are we going to do it? Tomorrow's
>        Easter.  She's calling the insurance company
>        on Monday.
>
> RR:   Oh.
>
> JZ:   It's a big roof, it's a nice roof job we can
>        do.
>
> RR:   Okay.

40.  On or about April 3, 2010, ZAMBARANO and RICCI caused damage

to SERGIACOMI's roof for the purpose of filing a false

insurance claim and thereby creating work for themselves.


41.  On or about April 3, 2010, at approximately 12:31 p.m.,

ZAMBARANO and RICCI discussed the fact that DIPAOLO had

taken steps to conceal their scheme from the insurance

company:

> RR:   Now what if they want to go inside and see the
>        house where it's leaking?
>
> JZ:   I already got that, Vinny's already got that
>        covered.

16

RR:   How?

JZ:   He's got it.   He did it.

RR:   Oh, okay.

42.   On or about April 3, 2010, at approximately 2:38 p.m.,
ZAMBARANO and RICCI discussed the damage they caused to
SERGIACOMI's residence and DIPAOLO's role in orchestrating
the false insurance claim:

> RR:   Wow...unreal.   That Vinny's too much though.
> That guy's made a career out of fuckin'
> shiesterin'.
>
> JZ:   I know.
>
> RR:   Does he do anything honest?
>
> JZ:   I don't think so.
>
> RR:   I just can't believe he makes a living, he makes a
> good living out of just...I can't believe it. His
> whole life, his whole career probably, is doing
> things like that.
>
> JZ:   I took him over to Lori's house the other night.
> He said, "Who is the ins... who is the
> insurance?"   It was Rhode Island Housing or
> something.   "Oh..oh... I know...
> (UI)... we'll be able to work this out."   He
> knows all the fuckin' agencies.   All the
> fuckin' adjusters.
>
> RR:   Gives them all kickbacks.
>
> JZ:   Yeah.
>
> RR:   Unbelievable.   What are you going to do?   I
> just laugh.   I just say "Oh my God. We're over
> there patchin' fuckin roofs."   So ridiculous.
> What are you gonna do?   What you gotta do to
> survive is ridiculous.

JZ:   I know...I know.

RR:   It's the truth.  What are you gonna do? You got no
      choice.  It's terrible.

43.   On or about April 5, 2010, SERGIACOMI contacted the local

insurance agency and falsely reported that her residence had

been damaged in a windstorm occurring on April 5, 2010, when

she knew that in truth and in fact that any damage to her

residence was related to the floods of March 2010 and

damage caused and exacerbated by ZAMBARANO, RICCI, DIPAOLO

and herself.

44.   On or about April 5, 2010, SERGIACOMI caused the local

insurance agency to submit an insurance claim to the

Insurance Company which falsely claimed that the "date of

loss" was April 5, 2010 and that the cause of loss was "wind

and rain water."

45.   On or about April 5, 2010, at approximately 11:14 a.m.,

SERGIACOMI and ZAMBARANO discussed the fact that SERGIACOMI

lied to the insurance agency about her insurance claim:

JZ:   Hey Lor. Did you talk to Vinny?

LS:   Yup, I did.  I talked to the [the local insurance
      agency]. I  talked to [Name of employee of the
      local insurance agency, whose identity is known to
      the grand jury].  And I was, uhm, I was telling
      her about all the damage.  She's like, "Did it

18

come from the ground?" I said, "No. If it did
would be calling up FEMA." When I told Vinny that
he laughed. I said it came from the ceiling.
said, and uhm....I said, it dripped down into the
cellar. I mean...(UI)...down into the cellar. I
said the roof is ruined. You know, I got a branch
in my pool. She goes, "I don't know, the pool, if
they'll do that." She goes, "I'll put a claim in
anyway." I said, "They better. It's a new pool
liner and there's a big stick in it. There's a
big branch in it."

46. On or about April 5, 2010, during the conversations that

began at approximately 11:14 a.m., SERGIACOMI and ZAMBARANO

discussed the fact that as a result of damage ZAMBARANO

caused to SERGIACOMI's swimming pool, SERGIACOMI would get a

new pool cover paid for by the Insurance Company:

    LS: Are we gonna be able to seal that ...that pool
        cover, eventually?

    JZ: No, they'll give you a replacement cover.

    LS: You know how expensive those thing are?

    JZ: They'll replace it.

    LS: You know how expensive those are?

    LS: You think?

    JZ: Yeah, it got ruined.

    LS: Oh, that would be cool.

    JZ: Alright.

47. On or about April 6, 2010, ZAMBARANO and DIPAOLO caused

additional damage to SERGIACOMI's residence in anticipation

of a visit by an insurance adjuster on behalf of the

19

Insurance Company to SERGIACOMI's residence.

48.   On or about April 7, 2010, at approximately 3:09 p.m.,
      SERGIACOMI and ZAMBARANO discussed the additional damage
      ZAMBARANO and DIPAOLO were causing to SERGIACOMI's
      residence:

>       JZ:   Yeah, we're here.
>
>       LS:   Oh, shit.
>
>       JZ:   So we're doing some stuff.
>
>       LS:   Well, I... Are we doing more damage that I
>             don't need done?
>
>       JZ:   No, that you need done.  A little bit.
>
>       LS:   Oh, God.  Which means more money to fix it.
>
>       JZ:   No...you got to to get the money, Lor.

49.   On or about April 7, 2010, ZAMBARANO caused additional
      damage to SERGIACOMI's residence in anticipation of a visit
      by an insurance adjuster on behalf of the insurance company
      to SERGIACOMI's residence.

50.   On or about April 8, 2010, at approximately 7:33 a.m.,
      ZAMBARANO and DIPAOLO discussed the additional damage
      ZAMBARANO caused to SERGIACOMI's residence:

>       JZ:   Vin.
>
>       VD:   Hey, what's up?

20

JZ:  Wait till you see Lori's house.  Your gonna want
     me to be your demolition man all the time.  I
     spent three fucking hours over there getting
     everything ready.

VD:  (laughs) Does it look good?

JZ:  Yes, it does.

VD:  Alright, good.

51.  On or about April 8, 2010, at approximately 8:20 p.m.,

ZAMBARANO and SERGIACOMI discussed items SERGIACOMI would be

able to get as a result of the fraudulent insurance claim:

JZ:  Well...you're gonna get a....brand new roof,
     brand new bathroom, brand new..uh..walls in the uh
     porch there, whatever room you call that, with
     the...casino rug.

LS:  Yeah, that's pretty big.

52.  On or about April 8, 2010, during the conversation that

began at approximately 8:20 p.m., ZAMBARANO and SERGIACOMI

discussed concerns about the upcoming visit by the insurance

adjuster representing the Insurance Company:

JZ:  Yeah. Alright, so you're not nervous or nothin'?

LS:  No, I'm not nervous.  The only thing I'm nervous
     about is the insurance company here saying, okay
     fine.  They do that, I am not nervous.

53.  On or about April 8, 2010, during the conversation that

began at approximately 8:20 p.m., ZAMBARANO and SERGIACOMI

discussed SERGIACOMI's concerns that ZAMBARANO may have done

more damage than the Insurance Company would pay for:

> JZ:   I would've never done all that damage if I didn't
>        think they're gonna pay for it. Lor. It's all
>        gonna be...
>
> LS:   I know that.
>
> JZ:   It's all...
>
> LS:   No, I know.
>
> JZ:   ....(UI)..the stage.
>
> LS:   (UI)...till I hear everything's good....I, I
>        just, you know, cause I think there might be
>        more damage than money.
>
> JZ:   No.  Nope.  You're gonna have money left over.
>        Trust me.

54.   On or about April 8, 2010, during the conversation that

began at approximately 8:20 p.m., ZAMBARANO advised

SERGIACOMI not to let others see the damage caused to her

residence:

> JZ:   Until the insurance company comes, don't let
>        many people see anything.
>
> LS:   But, John I'm trying not to, like the cop across
>        the street saw the ceiling before....you know...
>
> JZ:   Yup.
>
> LS:   And it's like.  I'm scared they're going to talk
>        to him.  It's like, I'm trying not to let people
>        in here.  I'm not letting anyone in here but
>        [Name of person whose identity is known to the
>        Grand Jury].
>
> JZ:   Alright.

55. On or about April 8, 2010, during the conversation that began at approximately 8:20 p.m., ZAMBARANO furter advised SERGIACOMI not to let others see the damage caused to her residence:

JZ: Not till the whole thing is done.  Until the insurance is all set.

LS: No, never mind that I... these people have seen... like [Name of person whose identity is known to the grand jury] has seen the damage.  I can't have him see it now.

JZ: No! Then he's seen it before?

LS: That's the problem, too many people did.

JZ: Yeah.

LS: That I can't let in my house.

JZ: No, you can't.

LS: And they don't know why, and I'm sick every day, John.

JZ: We had to do, I had to do that construc... that destruction.

LS: I know that, but I'm telling you I can't let them in my house and I'm sick every day.  They're gonna think I have the...they're gonna think I have AIDS, you know.

JZ: By...by Monday it'll all be over. You can let anybody else you want in cause it doesn't matter after that.

LS: Right, exactly.  Well, it still does to me.  Well you know upstairs is nothing as long as they don't see downstairs. Upstairs they know about the leakage.  They've seen it. It's no big deal.

JZ: Yeah, but not what I did.

23

LS:   The pool cover is covered with a welcome mat.
      They won't see that.

JZ:   Not what I did.  Yeah, I mean I don't want anybody
      to see what I did to the pool or the den area
      with that paneling wall.

56.   On or about April 8, 2010, during the conversation that

begin at approximately 8:20 p.m., ZAMBARANO and SERGIACOMI

further discussed the proceeds SERGIACOMI would receive from

the fraudulent insurance claim:

JZ:   Just remember in the back of your mind.
      You're gonna have a new bathroom, new
      kitchen.

LS:   John, you're, you're like my, my dad.

JZ:   I know. And you're gonna have money left over.
      (Laughing)

LS:   Good. I need it.

57.   On or about April 9, 2010, DIPAOLO met with the insurance

adjuster for the Insurance Company regarding the insurance

claim at SERGIACOMI's residence and falsely represented that

the damage to SERGIACOMI's residence was caused by a wind

storm on 5, 2010.

58.   On or about April 9, 2010, at approximately 2:22 p.m.,

ZAMBARANO and SERGIACOMI discussed DIPAOLO's meeting with

the adjuster for the Insurance Company:

JZ:   Hey, Lor.

24

LS:   What's up?

JZ:   Vinny, Vinny called me. Everything went well.

LS:   Yeah.  Alright, good.  Then I'm not worried
      anymore.

59.   On or about April 13, 2010, at approximately 6:15 p.m.,
ZAMBARANO and SERGIACOMI discussed DIPAOLO falsely inflating
the amount of money in the insurance claim to at least
forty-thousand dollars and expressed concern that otherwise
there would not be enough money to pay for more than the
damage caused by ZAMBARANO, RICCI and DIPAOLO:

LS:   I was just telling Vinny, I'm like, he's like
      going "It's gonna be like twenty-something."
      I said, "Vinny, that's not enough."   I said,
      "That seriously is nowhere near enough, do you
      realize a pool cover alone is $3,000?"

JZ:   That's not enough.

LS:   You're gonna..you're gonna end up patching
      that...but I  mean, I'm telling him that's
      not enough and he's like "Then we'll go for
      damages now."  I'm like, "Vinny, I got bugs
      coming out of my cellar walls like what is
      going on?" And he's like, "Well we're still
      negotiating and they're talking about damages
      and everything," and I'm like, he's like
      "Maybe I can get you like in the 30's."  I
      said "You got to."  I said "Do more.  I'm
      gonna tell you right now, I know Zambarano
      and he can go through a room and it could be
      like $30,000."

JZ:   (laughing)

LS:   I said, "Really."  I said, "Seriously." I said,
      "You know the roof alone.  He's looking       at

25

like, you know, sixty-five, when I can get
somebody to do it for thirty-five, but I
gotta let him do it because of the
connection." But.. um.. I'm like, you know,
I've gotta think of places I can save, too.
Because, John it's not gonna cut it. You
know it's not gonna cut it.

JZ: Yeah. No, you gotta get more.

LS: I told him that, I says, "There's no way,
twenty-something, it's not gonna, especially
giving him ten percent.

JZ: No.

LS: I said "It's not gonna work, Vinny." I said, "I
mean the damage that we caused that's what it's
gonna cover." I said "You gotta get more." He
said that he was gonna sit down with you. You're
doing the numbers. He's going "The numbers the
guy wants to know about damage." I said "You gotta
do more. I don't even know if the pool is wrecked
because nobody is doing anything about it. I'm
afraid to take the water out of it because that
could wreck it. Then again, if I leave it in it
could wreck it. I don't know what to do here."
So, he said he's gonna get together with you and
get his pool company over here and you guys gotta
go through numbers and stuff because, John, he
needs to bring that amount of money up. Because
this is just not gonna work.

JZ: No, especially what we did over there now.

LS: That's what I'm saying. There's no way,
twenty-something with ten percent gone,
hello.

JZ: We gotta get like forty.

LS: Yeah, no shit. That's his job, I said. He's
gonna get it. I already told him that
twenty-something is not acceptable. There's
no way. That's not even gonna cover the
damage that we caused.

JZ: (laughing) You mean we, or me?

LS:   Hey, I'm in this too.

60.  On or about April 13, 2010, during the conversation that
     began at approximately 6:15 p.m., ZAMBARANO and SERGIACOMI
     discussed the damage ZAMBARANO caused to SERGIACOMI's
     swimming pool:

     LS:   Do you realize alone if that pool is ruined.
           Alone, when I had it re-done, was $14,000, alone.
           Just the pool.  If that pool is ruined, that's not
           cheap.

     JZ:   Well what did Vinny say?

     LS:   Vinny said, "Well, you gotta see if it's ruined."
           He's gotta get his pool guy here,  but you're not
           gonna know that until the water is out and the
           liner is being put on....you're not gonna know it.
           If that water seeped behind it can reconstruct
           itself.  I've seen it do it.

     JZ:   You can't patch that hole in that liner, not
           the hole that I put.  You can't do that.  That's
           gonna be (UI).

     LS:   Yeah you can.  Yeah you can, because my father...
           I'm not spending $3,000 on a pool cover that I'm
           gonna have a  problem fitting.  That can be
           fixed....(UI)...

     JZ:   No, I'm talking about the liner, forget the cover,
           the  liner.

     LS:   Oh no, the liner can't be fixed.  The liner has to
           be  thrown away, and what sucks is the  liner is
           not even two years old and still under guarantee
           but they're not gonna guarantee it against this.

     JZ:   Alright.  I'll call Vinny tomorrow.

     LS:   I told Vinny he's gotta do something.   I said
           "Twenty-something is not acceptable.  I can't do

                              27

that.  I said, I can't do that.  I said, "John would be thirty thousand in one room, are you serious?"

61.  On or about April 13, 2010, during the conversation that began at approximately 6:15 p.m. ZAMBARANO and SERGIACOMI further discussed inflating the amount of money for the insurance claim:

JZ:  Alright.  I'll call Vinny up.

LS:  I know.  I just pushed him.  I told him he's gotta get more.  There's no way I'm taking twenty-something.  There's no way we're doing this....that's crazy, there's no.  I told him.  I said "Vinny, we can't even repair the damage we did with that, never mind what's done."

62.  On or about April 13, 2010, at approximately 6:28 p.m. ZAMBARANO and DIPAOLO discussed the amount of money they could put in the insurance claim:

JZ:  Uhm,..Lori called me.

VD:  Yeah.

JZ:  She's all screamin', sayin' that twenty-thousand somethin' ain't gonna be enough. The damage we did.

VD:  Oh, I told her it was going to be in the high twenties and that doesn't count the pool. That's what the guy told me on the phone.  I said, well I need to see the paperwork.  I said her contractor is doing up an estimate now.  So, I don't know what it's gonna come to.  I told her that.  I said Lori, nothing's in concrete yet.  I

28

said, you know, the guy just hit me with a number you know, like high twenties, and plus the pool. I said, now you're looking around. I said how much you think the fucking roof is on that house, it's about $12-15,000. I said the rest is all the inside work is sheet rock and paint work, hell what the fuck, what's in there, nothing much to talk about...

JZ:  Yeah now, that roof job, let's just. I tried to explain to her, I know someone told me that could do it for thirty-five hundred. I said listen to me. I just did a roof job half the size of your roof job and took one layer of shingles off. It was fifty-nine hundred. That roof has two layers. It's double the...uh ....uh... the squares. That roof's gotta be close to ten.

VD:  Gotta be twelve thousand at least John. At least twelve thousand to do that roof.

JZ:  I know.

VD:  That's a hip fucking roof. I might go even a bit more like thirteen or fourteen.

JZ:   I know.

VD:  You know. So I told her that. I said, "That's not a cheap roof." I said, "But when you got twenty-five thousand in your fucking hand and you know, and you got like ten, or twelve thousand left over to do the inside work, that's a good fucking chunk of change to take care of." She goes, "Oh John's never gonna be able to do all that work for twelve thousand." I said "Listen honey, we're not rebuilding you fucking house." You know. We're only gonna get so much friggin' money here. You know, there's only so much money on the table.

63.  On or about April 13, 2010, at approximately 7:04 p.m., ZAMBARANO and RICCI discussed the amount of money they could put in the insurance claim for the damage to SERGIACOMI's

roof:

> JZ: That's probably going to be close to ten grand, isn't it?
>
> RR: Nah.
>
> JZ: No?
>
> RR: Are you nuts?
>
> JZ: Vinny said more like twelve or fourteen.
>
> RR: (UI)...that's what Vinny said?   He knows best. Vinny took us this far.   He'll take us the rest of the way.

64. On or about April 13, 2010, during the conversation that began at approximately 7:04 p.m., ZAMBARANO and RICCI further discussed the amount of money they could put in the insurance claim for the damage to SERGIACOMI's roof:

> RR: Yeah.  So I mean the point is.....(UI)..that job there is probably be like a grand more maybe twelve hundred more.   Fifty-nine... fifty-nine..that would be about seventy-five hundred to be honest with you.
>
> JZ: Yup.

65. On or about April 15, 2010, at approximately 12:54 p.m., ZAMBARANO told DIPAOLO repairing the damage to SERGIACOMI's roof would cost $9,000:

> VD: What's up....what's up?
>
> JZ: The best thing we can do on that roof for Lori is $9,000.  And that's a good price, because there's

30

a lot of work over there.

VD:  A lot of work there buddy for nine grand.   That's
cheap.

66.  On or about April 15, 2010, during the conversation that
began at approximately 12:54 p.m., DIPAOLO told ZAMBARANO to
provide an estimate for SERGIACOMI's roof that was
substantially more than $9,000:

VD:  Give me an estimate for like $15,000, to do the
roof.

JZ:  Alright.

67.  On or about April 16, 2010, at approximately 10:57 a.m.,
ZAMBARANO and SERGIACOMI discussed providing inflated cost
estimates to DIPAOLO for the purpose of filing a false
insurance claim:

JZ:  Well can I come over at eight?  Because Vinny
needs these numbers tomorrow.

LS:  What?  Yeah.  Alright.

JZ:  Cause we got to go discuss what were gonna do
here.

LS:  Well what did he get for a figure yet?

JZ:  He said...he doesn't got nothing yet.  He said, "I
need some numbers first."  He said, "They got to
be....they got to be... uh... uh... uh...they got
to be inflated a bit too."

LS:  Alright.

31

68.  On or about April 16, 2010, at approximately 8:17 p.m.,

ZAMBARANO met with SERGIACOMI at SERGIACOMI's residence and

together had a telephone conversation with DIPAOLO regarding

the insurance claim:

JZ:  Vinny.

VD:  Yeah.

JZ:  I'm over Lori's going over stuff so I can get
this thing together for you tomorrow.  You know
all kiddin' aside.  The damage that I did in that
bathroom.  That, I mean, we busted tile and
everything.  This whole tile thing has to be
replaced. Your talkin' some serious money in this
bathroom.  So I don't know what this guy's sayin'.
What does this guy expect you to do?  Just patch?
You can't get this tile anywhere.

VD:  No, you got to use regular tile again.   You
can't do a mud job anymore, obviously. You got to
get..(UI)..

JZ:  No, I know that, but I mean...but all the tile in
the whole bathrooms got to go.

VD:  Yeah, well, do it.  So figure it in.

69.  On or about April 16, 2010, during the conversation that

began at approximately 8:17 p.m., ZAMBARANO and SERGIACOMI

discussed with DIPAOLO increasing the amount of the

insurance claim to fifty thousand dollars:

LS:  (In background - Vinny we're looking at fifty
grand here.)

JZ:  Lori says you're looking at fifty thousand.

LS:  (Talking in background)

VD:  If it's fifty thousand, I'll get it. Don't worry

about it.

JZ: He'll get it. Don't worry about it.

70. On or about April 16, 2010, during the conversation that began at approximately 8:17 p.m., ZAMBARANO and SERGIACOMI further discussed with DIPAOLO falsely increasing the amount of the insurance claim insurance claim:

JZ: Do you hear her?

VD: What she say?

JZ: She said she loves you, but you got to upgrade these fuckin' figures (laughing).

VD: Tell her not to worry about it. I'm the numbers guy.

JZ: He said he's the numbers guy. Hang on.

[SERGIACOMI begins talking on phone]

LS: Wait...wait...wait mister numbers guy. I'm going from wood in my den to sheet rock or whatever the hell you guys are putting in. I'm going cheaper here. I'm trying to like use the money where the money needs to be used.

VD: Absolutely.

LS: Yeah. You got to get...Yeah, but you got to get more because I got to tile half downstairs. I can't go with all rug. I'm never doing that again, plus everything's gotta be sealed John. That's another thing. I'm petrified about that happening again. Lookin' at ...I mean were lookin' at so much stuff here Vinny, that, help!

VD: Listen.

LS: You need to do your numbers...number man do your numbers...do your numbers.

71. On or about April 16, 2010, during the conversation that
began at approximately 8:17 p.m., DIPAOLO cautioned
SERGIACOMI and ZAMBARANO about inflating the insurance claim
so high that it would cause additional scrutiny from the
Insurance Company:

> VD: Listen let's...let's just cross our fingers on one
> thing (UI). If we hit them too high that they
> bring in a contractor and he walks into that room,
> and he notices the sump pumps in there, and then
> he goes off on a half cocked expedition saying
> "Well, wait a minute." You know what I'm
> saying? So let's, let's take it easy now. We
> can't push it too hard. We're gonna get, we're
> gonna get what we can get to get everything done.
> And we're not gonna get everybody to look, you
> know, look a little closer at the job and then all
> of a sudden everything's gonna go sideways.

72. On or about April 16, 2010, during the conversation that
began at approximately 8:17 p.m., DIPAOLO further cautioned
SERGIACOMI and ZAMBARANO about inflating the insurance claim
so high that it would cause additional scrutiny from the
insurance company:

> VD: I don't want to  that job under the microscope,
> if you know what I saying.
>
> LS: Yeah, I know what you're saying, honey.  I know
> what you're saying. The only thing I know is what
> we're getting is not gonna cover, but....
>
> VD: I know, I know, but...
>
> LS: I mean, basically, John and I did more
> destructive damage then we're gonna get.

VD:   Oh, I know that, I understand. I'm gonna get you.

LS:   That's not good.

VD:   I'm gonna get it all. Every time it goes up,
      Listen. When a claim goes to $25,000, one person
      can sign it. When the claim goes to $50,000, two
      people have to sign the check.

73.   On or about April 16, 2010, during the conversation that
      began at approximately 8:17 p.m., SERGIACOMI directed
      DIPAOLO to submit the insurance claim in the highest amount
      possible with the least amount of scrutiny:

LS:   You're saying we don't want to make it out too
      high, but we don't want to make it too low.  Once
      you hit $50,000, then they start bringing in a
      second person.  So, I say bring it to $48,000 and
      that's it.

74.   On or about April 16, 2010, during the conversation that
      began at approximately 8:17 p.m., SERGIACOMI and DIPAOLO
      discussed including in the false insurance claim a desk
      which was damaged in an earlier flood:

LS:   My question to you is, what if I had a flood
      down there a few years ago? Actually, after
      I totally remodeled, within three months after I
      remodeled, I had a flood down there and, uhm, my
      father's desk was damaged a little bit.  I think I
      have a different insurance company now. Can I
      still claim that same desk?

VD:   Uhm...that could come back to bite you.

LS:   I could say I had it fixed.

VD:   Yeah.

LS:   Cause the guys that were doing the water noticed

35

it and they said "Look at that the desk is already ruined."

VD:   Yeah, you could do that.  Just well...just put in for the desk, but you can't like $5,000 for the desk.  Put in like...be just conservative.  Put down you know fifteen, eighteen hundred bucks, something like that.

LS:   Go low. Go low, okay.

VD:   Yeah.

LS:   Alright.

75.   On or about April 16, 2010, during the conversation that began at approximately 8:17 p.m., DIPAOLO told SERGIACOMI that DIPAOLO and ZAMBARANO would create estimates to submit in the insurance claim:

VD:   I'll get you through this here nice and smooth. Once John gets me that estimate then I'll ...I'm gonna (UI) John's estimate into my estimate.

LS:   What should John's estimate be?  Just tell me what it should be.  Listen, John could go off. He's talking about all tile in the bathroom and everything.  He could go...he could go to $100,000.

VD:   Listen, when John comes to me tomorrow with that paperwork, him and I will sit down and we'll crunch some numbers.

LS:   Alright.

76.   On or about April 17, 2010, at approximately 10:53 a.m, ZAMBARANO told SERGIACOMI that DIPAOLO would submit an estimate of approximately $48,000 for the insurance claim:

36

LS:   You don't think forty-eight thou..is too high
      to show them though?

JZ:   No.   He's the ...he's the...he's the guy that
      knows what he's doing with this.

LS:   Okay.

77.   On or about April 17, 2010, during the conversation that

      began at approximately 10:53 a.m, ZAMBARANO and SERGIACOMI

      discussed that SERGIACOMI would get a new roof as a result

      of the insurance claim:

LS:   I'm psyched ...I'm psyched...I'm psyched because I
      think that's the original roof isn't it?

JZ:   Yeah.   It's got two layers on it.

LS:   I don't think my father ever did the roof or
      could he have added a layer?

JZ:   Yeah he did.

LS:   Because if you look at that roof isn't it a
      greyish?

JZ:   Yeah, but you're gonna get some nice
      architectural shingles.

78.   On or about April 17, 2010, during the conversation that

      began at approximately 10:53 a.m, ZAMBARANO and SERGIACOMI

      further discussed items of value that SERGIACOMI would get

      as a result of the insurance claim:

JZ:   I mean, maybe we can get a granite counter top
      in there.

LS:   God, I want granite in the kitchen.   That'll
      be my...that'll be my next goal.

JZ:   Well, look at it this way. None of this stuff
      is costing you any money.   You're getting a
      new roof...

LS:   I know.

JZ:   ...and everything so...

LS:   Like I said, like I said, even if I want to
      expand when you're done...

JZ:   Yeah.

LS:   ...(UI) here John, I'm gonna give you, you know
      $2,000 to redo these counter tops.

JZ:   Yeah exactly.

LS:   Yeah.

JZ:   Because, because it's not costing you any money
      right now to do any of this.

LS:   Right, exactly.   That's what I'm saying, so.

JZ:   And you're saving, you're saving like seven or
      eight thousand dollars just getting the roof done.
      You're getting the roof for nothing.

79.  On or about April 17, 2010, at approximately 1:55 p.m,

     ZAMBARANO and DIPAOLO discussed changing line items on

     ZAMBARANO's estimate of damages so that the claim would be

     less than $50,000, and therefore subject to less scrutiny by

     the insurance company:

     JZ:   ...It comes to $51,340.  You want me to take
           more away?  I did exactly what you told me to
           do.  I changed the numbers.  The numbers you
           changed.

     VD:   You should probably chop the roof down a little
           bit.  What are you doing?

JZ:   Want to take the roof down to twelve?

VD:   Yeah. Take the roof down to thirteen.

JZ:   Thirteen...alright.

80.   On or about April 18, 2010, ZAMBARANO provided DIPAOLO with
      a fraudulent estimate of costs for repairs to SERGIACOMI's
      residence in the amount of $49,188 for submission with
      SERGIACOMI's insurance claim.

81.   On or about April 19, 2010, at approximately 7:59 a.m.,
      ZAMBARANO and SERGIACOMI discussed the filing of the false
      insurance claim:

      JZ:   I just gave everything... uhm...to Vinny... the
            final thing.

      LS:   Cool.

      JZ:   Now, he said once it's settled...once they come up
            with the amount.  It's still gonna take a few
            weeks.  He said, "So once she knows how much money
            she's gonna ... she's gonna get, youse can start
            figuring out what youse are gonna do...(UI). If
            she has the money she can get it and then she'll
            get reimbursed."  I said "Well, I don't know."

      LS:   Mmm...yeah...right.

      JZ:   So I mean, I said she wants everything done,
            especially the pool for the summer and
            everything. He said, "I understand that John."  He
            said, "But it takes time."

      LS:   How long does it take? They usually do it right
            away.

      JZ:   I don't know.

                                39

LS: Once it's approved you usually get the check like within a week.

JZ: (UI)..that's what I say.

LS: No, that's what they've always done.  I've never gone for such a high amount.

JZ: That's the thing.

LS: What?

JZ: The amount.

LS: We'll see.

82. On or about April 19, 2010, DIPAOLO submitted an estimate of costs for repairs to SERGIACOMI's residence to the insurance adjuster representing the Insurance Company which was fraudulent in that it falsely represented the amount of money required to repair SERGIACOMI's residence in connection with a wind storm on April 5, 2010.

83. On or about April 21, 2010, at approximately 8:37 p.m., ZAMBARANO and RICCI discussed the damage ZAMBARANO caused to SERGIACOMI's residence in order to create work for ZAMBARANO and RICCI:

JZ: Bob.

RR: Yeah.

JZ: Get ready.  A lot of jobs I've got comin' up.

RR: Get 'em John.  I need some fuckin' money, get 'em, get' em.

JZ:   Me too.

RR:   I've got to make some fuckin' cash.

JZ:   If...if...if we do all these three jobs.

RR:   Yeah.

JZ:   The one over the...where we were today.  The
      one on Alexandria and Thelma Street and Tanya
      Cruise's.  You know how much work I made to do on
      her house? The damage I did.  You wouldn't
      believe.

RR:   Good.  Get to work Zamby!  Get to work!

JZ:   You wouldn't believe.  I destroyed her house.

RR:   Good.  Let's get the fuckin' work, come on.

JZ:   Alright.

RR:   Take it on.  We'll do it.  I'll work around the
      clock.  I don't give a fuck.

JZ:   Neither do I.


84.   On or about April 23, 2010, at approximately 8:16 a.m.,

      ZAMBARANO and RICCI discussed the status of SERGIACOMI's

      insurance claim:

      RR:   Are they giving Tanya Cruise a hard time?

      JZ:   No, but there's a lot more money involved over
            there, Bob.  The roof.  The pool.

      RR:   Oh yeah.  It's a big claim.


85.   On or about April 23, 2010, at approximately 8:54 a.m.,

      ZAMBARANO and SERGIACOMI discussed the status of

                              41

SERGIACOMI's insurance claim:

JZ:  Lor.

LS:  Yes.

JZ:  I just talked to Vinny. He said, all the
paperwork that I gave him, all the estimates
and stuff for the work inside and the roof is
already being processed. He said, the pool
thing is a different claim. He says, and
he's got to get out there this weekend with
the pool guy and he'll put that claim in.
He say's it's two separate things anyway so.

LS:  I know they are.....I know they are.

86.  On or about April 28, 2010, DIPAOLO submitted a fraudulent
estimate of costs for repairs to SERGIACOMI's residence in
the amount of $44,703.72 on behalf of with SERGIACOMI's
insurance claim.

87.  On or about April 29, 2010, at approximately 11:29 a.m.,
ZAMBARANO and RICCI discussed ZAMBARANO's concern that law
enforcement might have followed his vehicle:

RR:  Well, what makes it weirder is we have such guilty
consciences that anytime any of this
happens, right off the bat we always assume
the worst.

JZ:  I know...I know.

RR:  Because we have a guilty conscience of  everything
else that we're doing that we're not supposed to
be doing.

JZ:  I know....I know....yup..yup.

RR:  That's the problem.  Do you understand?

42

JZ:    Yeah, I know.

88.  On or about May 28, 2010, DIPAOLO sent an e-mail regarding
     SERGIACOMI's insurance claim to the insurance adjuster
     representing the Insurance Company in which he stated, in
     pertinent part: "I looked over your numbers and discussed it
     all with her contractor and after a long heated debate
     between her and him and myself this is what we came up with.
     The hip roof is damaged on both slope patches, so in all
     fairness to the homeowner, I think that we need replace the
     entire roof."

89.  On or about June 9, 2010, DIPAOLO, ZAMBARANO and SERGIACOMI
     caused an estimate for repairs to SERGIACOMI's swimming pool
     in the amount $5,500 to be submitted on behalf of
     SERGIACOMI's insurance claim.

90.  Throughout his dealings with the insurance adjuster
     representing the Insurance Company, DIPAOLO submitted
     various cost estimates which intentionally omitted the costs
     of the Water Removal Company from the insurance claim in
     order to avoid suspicion by the Insurance Company that the
     water damage was flood related.

43

91.  On or about August 17, 2010, SERGIACOMI signed and caused to
     be filed a "Sworn Statement in Proof of Loss" in which she
     falsely represented to the Insurance Company that the damage
     to her residence was caused by a windstorm on April 5, 2010;
     that the amount of the damage was $46,071.57; and that the
     loss "did not originate by any act, design, or procurement"
     on her part; that "nothing has been done by or with [her]
     privity or consent"; that "no articles are mentioned herein
     but such as were destroyed or damaged at the time of loss";
     and that "no attempt to deceive said company as to the
     extent of said loss, has in any manner been made."


All in violation of Title 18, United States Code, Section 371.

44

## Counts Two through Five
## Mail Fraud
## 18 U.S.C. 1341

## Introduction

92.   The Grand Jury realleges and incorporates by reference
paragraphs 1 through 91 of Count One of the Indictment as if
fully set forth herein.

## The Mail Fraud Scheme

93.   From no later than March 31, 2010 through on or about August
25, 2010, in the District of Rhode Island and elsewhere, the
defendants

JOHN A. ZAMBARANO
ROBERT RICCI
VINCENT DIPAOLO and
LORI SERGIACOMI

knowingly devised and intended to devise a scheme and
artifice to defraud, and for obtaining money and property
from the Insurance Company, by means of false and fraudulent
pretenses, representations and promises.

## Objects of the Scheme to Defraud

94.   The objects of the scheme to defraud were the same as the
objects of the conspiracy alleged in Count One and are
hereby realleged as if fully set forth herein.

45

## Manner and Means

95.  The substance of the scheme and artifice to defraud, its manner and means, and the acts in furtherance of the scheme are described in Paragraphs 1 through 91 of Count One of this Indictment, the allegations of which are incorporated by reference and realleged as if fully set forth herein.

## Execution of the Scheme to Defraud

96.  On or about the dates set forth below, in the District of Rhode Island and elsewhere, for the purpose of executing the aforementioned scheme and artifice, and attempting to do so, and aiding and abetting each other, the defendants,

> JOHN A. ZAMBARANO,
> VINCENT DIPAOLO,
> ROBERT RICCI and
> LORI SERGIACOMI a/k/a TANYA CRUISE

did knowingly cause to be delivered by United States mail or a private or commercial interstate carrier, according to the directions thereon, and did knowingly take and receive from the United States mail or a private or commercial interstate carrier, the material, to wit, checks, as set forth below:

| Count | Date | Check No. | Amount |
|-------|------|-----------|--------|
| 2 | 8/13/2010 | 518391 | $33,991.68 |
| 3 | 8/13/2010 | 518386 | $250.00 |
| 4 | 8/13/2010 | 518392 | $4,041.00 |
| 5 | 8/25/2010 | 518474 | $1,730.00 |

All in violation of Title 18, United States Code, Section 1341 and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATIONS

1. The allegations of Counts One through Five are realleged
and incorporated by reference herein for the purpose of seeking
forfeitures pursuant to the provisions of Title 18, United States
Code, Section 981(a)(1)(C) and Title 28, United States Code,
Section 2461(c).


2.   Pursuant to 18 U.S.C. § 981(a)(1)(C)and 28 U.S.C. §
2461(c), upon conviction, the defendants,

JOHN A. ZAMBARANO
ROBERT RICCI
VINCENT DIPAOLO
LORI SERGIACOMI a/k/a Tanya Cruise

shall forfeit to the United States, any and all right, title, and
interest in any and all property constituting or derived from any
proceeds the defendants obtained, directly or indirectly, as a
result of the offenses alleged in Counts One through Five of this
Indictment, which allege the use of the United States mail to
obtain of money and property from the Insurance Company, by means
of false and fraudulent pretenses, representations, and promises,
in violation of 18 U.S.C. § 1341 and conspiracy to commit the
same, and any and all property traceable to such property,
including, but not limited to a sum of money equal to $40,012.68
in United States Currency, in that this sum represents the amount
of proceeds obtained as a result of the offenses alleged in

48

Counts One through Five of this Indictment, for which the
defendants are jointly and severally liable.


All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. §
2461(c).


A TRUE BILL:


**REDACTED**


_____
TERRENCE P. DONNELLY·
Assistant U.S. Attorney

_____
STEPHEN G. DAMBRUCH
Assistant U.S. Attorney
Criminal Chief